1
2
3
4
5
6          **IN THE UNITED STATES DISTRICT COURT**
7              **FOR THE DISTRICT OF ARIZONA**
8

9   Strong College Students Moving          No. CV-12-01156-PHX-DJH
    Incorporated, et al.,
10                                           **ORDER**
                        Plaintiffs,
11
12  v.
13  College Hunks Hauling Junk Franchising
    LLC, et al.,
14
                        Defendants.
15

16          This action arises out of a dispute over the registration of the internet domain

17  name "collegehunksmoving.com" (the "disputed domain name") and the registration of

18  the COLLEGE HUNKS MOVING trademark.  Plaintiff Shaun Robinson registered the

19  disputed domain name on September 17, 2009.  On November 16, 2010, defendant

20  Friedman and Soliman Enterprises, LLC ("FSE") registered with that mark with the

21  United States Patent and Trademark Office ("USPTO"), Registration No. 3, 993,081 ("the

22  '081 Mark").

23          Plaintiffs Robinson and Strong College Students Moving, Inc. ("SCSM") brought

24  this action to, among other things, challenge a decision rendered by the National

25  Arbitration Forum ("NAF") in an administrative proceeding prescribed by the Uniform

26  Domain Name Dispute Resolution Policy ("UDRP").  The NAF ordered the transfer of

27  the disputed domain name from plaintiff Robinson to defendant CCHJ Franchising LLC

28  d/b/a College Hunks Hauling Junk ("CCHJ").  In their first cause of action, Plaintiffs are

seeking judicial review of the NAF decision, including a declaration that plaintiff Robinson registered the disputed domain name in good faith.  In their second cause of action pursuant to 15 U.S.C. §§ 1119 and 1064 of the Lanham Act, Plaintiffs are seeking cancellation of the '081 mark, alleging that Defendants fraudulently procured it from the USPTO.

Pending before the Court is Defendants' motion for summary judgment (Doc. 60), Plaintiffs' response (Doc. 64) and Defendants reply. (Doc. 65).  Upon reassignment, this Court *sua sponte* ordered the filing of supplemental memorandum on the issue of personal jurisdiction over the defendants and that has been done (Docs. 74, 76, and 82). The Court now rules as follows.

## I. Preliminary Matters

Before delving into the merits of Defendants' summary judgment motion, there are a few preliminary issues which the Court must address.

### A.  Scope of Second Amended Complaint ("SAC")

Through amendment and by the parties' agreement, the scope of the SAC has been narrowed somewhat.  In terms of the parties, the defendants now are CCJH, FSE, and "Doe Defendants 1-10."[1]  SAC (Doc. 75) at 1.  The SAC specifically alleges that "Does 1 – 10 are persons or entities, including but not limited to undisclosed principals or alter egos of or entities related to CHHJ, whose identities have not been ascertained."  (*Id.* at 2, ¶ 4).  The SAC further alleges that as to those Doe defendants, "Plaintiff [sic] will amend as the facts warrant."  (*Id.*)  To date, Plaintiffs have not sought amendment to identify any of these Doe defendants.  Nor does the record reflect that discovery has taken place to identify any of these defendants.  Therefore, the Court *sua sponte* dismisses Doe defendants 1 – 10 as parties to this action.  *See Cuevas v. Check Resolution Services*, 2013 WL 2190172, at *13, n. 11 (E.D.Cal. May 20, 2013) (internal quotation marks and citations omitted) ("The court has the authority to dismiss the Doe defendants *sua*

---

[1]     The original complaint also named as defendants Omar Soliman, Nick Friedman and their Jane Doe spouses, but not FSE.  Defendant FSE was not added as a defendant until the filing of the SAC.

*sponte*.")

Just as the parties have narrowed, so, too, have the causes of action. The SAC asserts three separate causes of action. Plaintiffs have agreed to withdraw with prejudice the third, alleging intentional interference with business/economic relations. Defendants' Separate Statement of Facts in Support of Summary Judgment ("DSOF") (Doc. 61) at 5, ¶ 34; Plaintiffs' Controverting Statement of Facts ("PCSOF") (Doc. 65) at 4, ¶ 34; Mot. (Doc. 61), exh. F (Doc. 61-2) at 3:7-19.

### B.  Plaintiffs' Statements of Fact

Defendants are seeking to strike roughly a third of the paragraphs in PCSOF on several grounds. First, Defendants accurately point out that the PCOSF violates LRCiv 7.2(m)(2) because the objections therein are not "stated summarily *without* argument[,]" as that Rule requires. *See* LRCiv 7.2(m)(2) (emphasis added). Therefore, to the extent that the PCSOF contains legal argument, as Defendants request, the Court is striking paragraphs 15, 25 and 32 of the PCSOF for violating LRCiv 7.2(m)(2).

Next, Defendants argue that "all of the 'controverting statements'" in PCOSF "should be stricken" for failure to cite to the record. Reply (Doc. 69) at 3:15-16 (citation omitted). Defendants add that the record admissible evidence contradicts some of the impermissible legal arguments in the PCSOF. Paragraph 15 in the PCSOF, lacking both a record cite *and* misstating the record, illustrates well the shortcomings in both the PCSOF. There, in disputing the DSOF, it asserts that "Plaintiff believed his obligation to register the Disputed Domain was implied by his duties in the 'Term Sheet.'" PCSOF (Doc. 65) at 3, ¶ 15. In direct contravention of Fed.R.Civ.P. 56(c)[2] and LR Civ 56.1(b),[3] Plaintiff did not support that assertion by citing to the record. Failure to cite to the record

---

[2]     Fed. R. Civ. P. 56(c) (1) provides that "[a]" party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)-(B).

[3]     That Rule requires, among other things, "a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed[.]" LRCiv 56.1.

is never excusable.  *See* Fed.R.Civ.P. 56(c)(3) (emphasis added) ("The court need consider *only* the cited materials[.]").  But this failure is particularly glaring where the record is not particularly voluminous.

Paragraph 15 also includes the wholly unsupported assertion that "[t]he term sheet . . . shows Defendants did direct Plaintiff to register the Disputed Domain [name.]" PCSOF (Doc. 15) at 3, ¶ 15.  Even more troubling than the failure to provide a record cite, is this misstatement of the record.  Nowhere in the Term Sheet did Defendants ever direct Plaintiff to register the disputed domain name.  Strongly advocating for one's client is entirely appropriate; misstating the record is not.  Thus, to the extent the PCSOF fails to cite to the record, or misstates the record, the Court is striking and will not consider such statements.  In particular, as Defendants request, the Court is striking paragraphs 1, 11, 13, 14, 21, 22, 26, 28, and 29 of the PCSOF.

## II. Background

Defendant FSE owns three trademarks which are pertinent to this litigation.   On December 5, 2006, defendant FSE obtained from the USPTO its trademark registration for "College Hunks Hauling Junk[.]"  DSOF (Doc. 61) at 1, ¶ 1; *see also* PCSOF (Doc. 65) at 2, ¶ 1.  On February 70, 2007, defendant FSE obtained its trademark registration for "College Hunks Hauling Junk," a "design mark[.]"  (*Id.* at 2, ¶ 2); (*Id.* at 2, ¶ 2).  On November 16, 2010, FSE filed its application with the USPTO to register "'College Hunks Moving[,]'" and on July 12, 2011, FSE obtained its trademark registration for that mark.  (*Id.* at 2, ¶¶ 3 and 7); (*Id.* at 2, ¶¶ 3 and 7)).  Defendant FSE is a Maryland corporation, organized on March 25, 2005.  Friedman Decl'n (Doc. 30-1) at 4, ¶ 4.  "FSE licenses the use of the COLLEGE HUNKS Marks" just identified, to "Defendant CHHJ, which is a subsidiary of FSE."  (*Id.* at 4, ¶ 15).  Defendant CHHJ is a Delaware corporation, organized on October 20, 2006, with its principal place of business in Tampa, Florida.  (*Id.* at 4, ¶ 17).

Plaintiff Robinson is SCSM's President and Chief Executive Officer.  DSOF (Doc. 61) at 2, ¶ 10; PCSOF (Doc. 65) at 2, ¶ 10.  Plaintiffs provide "moving, hauling, storage,

junk removal, moving boxes and supplies, moving labor and deliveries."  (*Id.* at 2, ¶ 8 (citations omitted); (*Id.* at 2, ¶ 8).  Plaintiffs provide those services in Florida, Georgia, North Carolina, Alabama, New York, and in several other states.  DSOF, exh. F (Doc. 61-2) at 10.[4]

Since 2009 or 2010, plaintiff SCSM and defendant CHHJ have been competitors in the same Florida market at least for hauling services.  DSOF, exh. F (Doc. 61-1) at 26. In 2009, plaintiff Robinson and defendants CCHJ entered into preliminary discussions regarding CCHJ's possible acquisition of SCSM.  *See* SAC (Doc. 75) at 5, ¶ 10; Answer (Doc. 48) at 3, ¶ 10.  As part of these discussions, CCHJ created a two-and-one-half page document (the "Term Sheet").  *See* SAC, exh. B (Doc. 75-1) at 5-7.  PHASE I of the Term Sheet, with a time line of January 1, 2010 to June 30, 2010, described the "Local MERGER of College Hunks Hauling Junk franchise and Strong Students Moving (soon to be College Hunks Moving Truck)[.]"  (*Id.* at 5).  The Term Sheet contemplated "CHHJ Tampa acquir[ing]/purchas[ing] Tampa based Strong College Students for a fictional dollar amount . . . [t]he acquisition will be for the sole purpose of rolling out a new moving product as a division of the "College Hunk" Brand" . . . the name of this brand is yet to be determined but should be put to a panel discussion – "College Hunks Moving" or "College Hunks Moving Truck."  (*Id.*)

The Term Sheet anticipated that "[t]he local CHHJ Franchise will transfer owners to a newly created LLC[,]" with the following ownership interests:  Mr. Soliman was to be a "34% owner," while Mr. Friedman and plaintiff Robinson were each to be "33% owner[s][.]"  SAC, exh. B (Doc. 75-1) at 5.  Plaintiff Robins was to "be granted creative control of College Hunks Moving Franchising LLC in addition to his role as the director of operations of the local Tampa Franchise."  (*Id.* at 6).  Further, according to the Term

---

[4]  For uniformity and ease of reference, all citations to page numbers of docketed items are to the page assigned by the court's case management and electronic case filing (CM/ECF) system.

Sheet, "[a]ll new moving service guidelines, operational manuals, software upgrades, training of new franchises and call center employee w[ere] to be derived under the direct supervision of the new D of O [director of operations, plaintiff Robinson]." (*Id.*) The Term Sheet includes a list of "Franchising Costs[,]" such as "Website: 2-4k[.]" (*Id.* at 7). As is evident from the face of the Term Sheet, it was never executed.

The SAC alleges that on November 11, 2009, Mr. Friedman e-mailed this Term Sheet to plaintiff Robinson. SAC (Doc. 75) at 5, § III, ¶ 10. Defendants admit that Mr. Soliman is copied on this e-mail, but because this e-mail does not include the purported attachment – the Term Sheet – Defendants answer that they are without sufficient knowledge as to whether the Term Sheet was actually attached to this e-mail. Answer (Doc. 48) at 4, § III, ¶ 10. The record is silent as to what occurred after the Term Sheet was emailed.

In the meantime, prior to that e-mail, on September 17, 2009, plaintiff Robinson registered the disputed domain name with GoDaddy, a domain name registrar in Scottsdale, Arizona. DSOF (Doc. 61) at 3, ¶ 11 (citation omitted). After that, as mentioned at the outset, on November 16, 2010, defendant FSE applied to the USPTO to register "'College Hunks Moving.'" DSOF (Doc. 61) at 2, ¶ 3; PCSOF (Doc., 65) at 2, ¶ 3. "Defendants submitted an image from [their] website as the specimen of use." (*Id.* at 2, ¶ 4) (citation omitted); (*Id.* at 2, ¶ 4). That "specimen of use of use included an electronic screenshot of Defendants' website as of November 16, 2010, showing moving services offered in connection with the trademark "'College Hunks Moving.'" (*Id.* at 2, ¶ 5 (citation omitted); (*Id.* at 2, ¶ 5). On July 12, 2011, defendant FSE obtained its trademark registration for that mark. (*Id.* at 2, ¶ 7); (*Id.* at 2, ¶ 7).

After learning that plaintiff Robinson had registered the disputed domain name, defendant CHHJ invoked the UDRP by filing a complaint before the NAF on April 2, 2012. DSOF (Doc. 61) at 4, ¶ 30 (citation omitted); PCSOF (Doc. 65) at 4, ¶ 30. Essentially, CHHJ claimed that plaintiff Robinson's registration of the disputed domain name was done in bad faith, and that that name was "identical to [CCHJ's] 'College

Hunks Moving' Mark[.]"  SAC, exh. F (Doc. 75-1) at 30 (emphasis omitted).  In its NAF complaint, CHHJ consented to jurisdiction of the courts in the location of the registrar at when the complaint was submitted to the NAF.  (*Id.* at 35).  Because plaintiff Robinson registered the disputed domain name with GoDaddy, located in Scottsdale, Arizona, based upon that provision, CCHJ consented to the jurisdiction of this Arizona court, among others.  Defendant FSE was not a party to the UDRP proceeding.

On May 17, 2012, the NAF found plaintiff Robinson's "domain name is identical to COLLEGE HUNKS MOVING trademark and is also 'confusingly similar to the COLELGE HUNKS HAULING JUNK trademarks."  DSOF (Doc. 61) at 5, ¶ 32 (internal quotation marks and citation omitted).  The NAF further found that plaintiff Robinson "registered the disputed domain name in bad faith . . . since he had actual notice of Defendant's trademark rights."  (*Id.* at 5, ¶ 33) (internal quotation marks and citation omitted); PCSOF (Doc. 65) at 4, ¶ 33.  The NAF ordered plaintiff Robinson to transfer the domain name to defendant CHHJ.  (*Id.* at 5, ¶ 31); (*Id.* at 4, ¶ 31).[5]

On May 30, 2012, Plaintiffs filed this action wherein two causes of action and two Defendants remain.  Defendants are seeking summary judgment as to both causes of action, claiming that the undisputed facts establish its entitlement to such relief.  Characterizing both causes of action as "groundless[,]" and claiming that it was "unreasonable" for Plaintiffs to pursue them, Defendants assert that that this case is "exceptional" within the meaning of 15 U.S.C. § 1117(a) of the Lanham Act.  Mot. (Doc. 60) at 13:17-18.  Thus, anticipating that they will prevail on their motion, Defendants are requesting attorney fees under that statute.

Plaintiffs oppose summary judgment arguing in the first instance that there is a genuine issue of material fact as to whether registration of the disputed domain name was

---

[5]    This summary of the UDRP proceeding is for background purposes only. *See Elliot v. Google Inc.*, 45 F.Supp.3d 1156, 1160 n.3 (D.Ariz. 2014) (quoting Fed.R.Evid. 401 advisory committee notes (1972)) ("facts concerning the UDRP proceeding" relevant as "'[e]vidence which is essentially background in nature . . . [and] . . . universally offered and admitted as an aid to understanding.'").  The Court will not, however, be giving any deference to these UDRP findings as discussed more fully herein.

done in bad faith.  Plaintiffs also argue that there is a genuine issue of material fact as to Defendants' "actual first use" of the '081 mark, which precludes granting summary judgment in their favor on the second cause of action, seeking cancellation of that mark.

**III.  Personal Jurisdiction**

Before addressing the merits, the Court will consider the issue of personal jurisdiction.  This issue need not detain the Court long as to defendant CCHJ.  CCHJ does not dispute the existence of specific *in personam* jurisdiction based upon paragraph 4(k) of the UDRP and the mutual jurisdiction provision of the NAF complaint.  SAC (Doc. 75) at 2, §1 ¶ 5; Ans. (Doc. 48) at 2, ¶ 5.  That mutual jurisdiction provision expressly states that:

> [CHHJ] will submit, with respect to any challenges to a decision in the administrative proceeding canceling or transferring the Domain Name, to the jurisdiction of the courts in the location of the Registrar at the time the complaint is submitted to the [NAF].

SAC. Exh. F (Doc. 75-1) at 35, ¶ VIII.  Here, the registrar is GoDaddy, where plaintiff Robinson registered the disputed domain name.  GoDaddy is located in Scottsdale, Arizona.  Therefore, this Court has personal jurisdiction over CCHJ based upon that mutual jurisdiction provision, as well as upon the UDPR.  *See* SAC, exh. E (Doc. 75-1) at 21.

Unfortunately, the parties' supplemental memorandum were not responsive to the more difficult issue of whether this Court has personal jurisdiction over defendant FSE, which was not a named party to the UDRP proceeding.  Defendants, instead, offered that they would not object to a transfer of venue to the Middle District of Florida.  The main reason for urging a transfer is that Tampa, Florida, which is in the Middle District, was the address given by Plaintiff Robinson, the registrant of the disputed domain name, on the Whois database when the NAF complaint was filed.  *See* Defs.' Supp. Br., exh. 2 (Doc. 76-2) at 3.  And, in accordance with the Rules for Uniform Domain Name Dispute Resolution Policy, which govern the UDRP proceeding, this action could have been brought in the Middle District of Florida, as well as here, where the registrar, GoDaddy,

is located.  *See id.*, exh. 1 (Doc. 76-1) at 8.

Plaintiffs' supplemental memorandum was similarly unhelpful in that it failed to differentiate between the two defendants.  This was particularly troubling given the SAC's allegations that this Court has specific jurisdiction over defendant FSE because, among other things, there is a principal/agency relationship between defendants FSE and CCHJ based upon the UDRP proceeding.  *See* SAC (Doc. 75) at 3, ¶ 6(e).  The SAC further alleges specific personal jurisdiction over FSE based upon the alter-ego doctrine. (*Id.* at 3, ¶ 6(d)).

These allegations raise some rather nuanced issues because, for one thing, typically, alter ego and agency are ways of establishing general, not specific, personal jurisdiction.  Also, in alleging an "alter ego" theory, the SAC expressly states, "as that phrase is applied in Arizona."  SAC (Doc. 75) at 3, ¶ 6(d).  Clearly Arizona law would apply to determine alter ego liability if this action was based upon diversity jurisdiction, but it was not pled that way.  *See Monje v. Spin Master Inc.*, 2013 WL 2390625, at *4 (D.Ariz. May 30, 2013) (citing cases) ("Since this is a diversity case, state law determines whether a parent company should be treated as the alter-ego of a subsidiary for jurisdictional purposes.")  Subject matter jurisdiction in this case is based upon several federal statutes, but not upon diversity of citizenship.  Therefore, it is less clear that Arizona law would apply under these circumstances.  *See Bates v. Bankers Life and Cas. Co.*, 993 F.Supp. 2d 1318, 1337 n. 6 (D.Or. 2014) ("[f]or federal jurisdictional purposes, . . . look[ing] primarily to federal alter ego and agency law to determine whether imputation of [one defendant's] contacts to [another] could be appropriate" under Ninth Circuit case law).  All of these issues, and more, went unanswered in the parties' supplemental jurisdictional memorandum -- not to mention the sparse factual record as to the myriad of factors which courts consider in making an alter ego or agency determination.

Given the procedural posture of this case, and the tangled personal jurisdiction issues as to defendant FSE, the Court deems it appropriate, for purposes of this motion, to

assume the existence of personal jurisdiction over defendant FSE.  *See Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at *2 (N.D.Cal. March 20, 2015) (quoting *Lee v. City of Beaumont*, 12 F.3d 933, 937 (9th Cir. 1993) *overruled on other grounds by Calif. Dep't of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).  ("In this circuit, . . . the Court may "assume the existence of personal jurisdiction and adjudicate the merits in favor of the defendant without making a definitive ruling on jurisdiction'"); *see also Dubray Land Services, Inc. v. Schroder Ventures U.S.,* 2007 WL 207807, at *3 - *4 (D.Mont. 2007) (same).  "In *Lee*, the Ninth Circuit found that the district court could assume personal jurisdiction in order to reach the question of whether to dismiss the federal claims asserted against the defendant." *Koninklijke Philips*, 2015 WL 1289984, at *2 (citing *Lee*, 12 F.3d at 937–38).  As more thoroughly discussed herein, Defendants are entitled to summary judgment.  Thus, the Court assumes without definitively deciding that it has personal jurisdiction over defendant FSE.  *See id.*

## IV.   Summary Judgment

### A.  Legal Standards

Pursuant to Fed.R.Civ.P. 56(c), a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Materiality and genuineness are distinct concepts.  As will be seen, Defendants' motion, or, more accurately, Plaintiffs' opposition thereto, does present an issue as to materiality.  It is thus worth noting that "[s]ubstantive law identif[ies] which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

It is beyond dispute that "[t]he moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).  "Once the moving

party meets its initial burden, . . . , the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citations omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Anderson*, 477 U.S. at 249 (citation omitted).  "If the evidence is merely colorable, . . . , or is not significantly probative, . . . summary judgment may be granted." *Id.* at 249-250 (citations omitted).  When assessing the record to determine whether there is a genuine issue for trial the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor." *Horphag Research*, 475 F.3d at 1035 (citation omitted).  However, at the summary judgment stage, the Court is not to weigh the evidence.  *United States ex rel. Ali v. Daniel, Mann, Johnson, & Mendenhall*, 355 F.3d 1140, 1150 (9th Cir. 2004).

## B.  Declaratory Judgment – First Cause of Action

### 1.  Subject Matter Jurisdiction

As one of the alleged jurisdictional bases, the SAC mentions "28 U.S.C. §§ 2201-2202[,]" that is, the Declaratory Judgment Act, and Plaintiffs title their first cause of action "Declaratory Judgment[.]"  SAC (Doc. 75) at 4, ¶ I(8) and at 10.  "[T]he Declaratory Judgment Act does not by itself confer federal subject-matter jurisdiction[,]" however.  *Nationwide Mutual Insurance Company v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005).  Therefore, Plaintiffs are "required to plead an independent basis for federal jurisdiction." *See id.*

Plaintiffs generally allege, although not in their first cause of action, that "Defendants had no *bona fide* basis for commencing the UDRP proceeding, and as such committed reverse domain name hijacking under the Anti-cybersquatting Consumer Protection Act (ACPA)."  SAC (Doc. 75) at 10, ¶ III(29).  Plaintiffs are seeking "statutory damages . . . for Defendant's [sic] violation of the ACPA reverse domain name hijacking provisions[,]" as well as a declaration that the disputed domain name is the property of plaintiff Robinson.  (*Id.* at 13, ¶ IV(4)(b); ¶ IV(1)).  Furthermore, Plaintiffs

are seeking to enjoin Defendants from "[f]urther wrongful attempts to prevent the use of the [d]isputed [d]omain" name.  (*Id.* at 13, ¶ IV(3)(b)).

The so-called "reverse domain name hijacking provision" of the ACPA is found in 15 U.S.C. § 1114(2)(D)(v).[6]  *See AIRFX.com v. AirFX LLC*, 2011 WL 5007919, at *2 (D.Ariz. Oct. 20, 2011).  This statute provides that:

> A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1142(D)(v).  This statute "allows an aggrieved domain name registrant to file a civil action to establish that his use of the domain name does not violate the Act [ACPA]."  *AIRFX.com*, 2011 WL 5007919, at *2 (citations omitted); *see also Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 27 (1st Cir. 2001) ("Under § 114(2)(D)(v), Congress has provided [domain name] registrants . . .  with an affirmative cause of action to recover domain names lost in UDRP proceedings.")

The SAC does not explicitly invoke 15 U.S.C. § 1114(2)(D)(v).  The SAC does explicitly refer though, not once, but twice, to the ACPA's reverse domain name hijacking provision, which is found in section 1114(2)(D)(v).  The existence of subject

---

[6]  As the Fourth Circuit succinctly put it in *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona,* 330 F.3d 617, 625 n. 1 (4th Cir. 2003):

> If a domain-name registrant cybersquats in violation of the ACPA, he "hijacks" the domain name from a trademark owner who ordinarily would be expected to have the right to use the domain name involving his trademark. But when a trademark owner overreaches in exercising rights under the ACPA, he "reverse hijacks" the domain name from the domain-name registrant. Thus, § 1114(2)(D)(v), enacted to protect domain-name registrants against overreaching trademark owners, may be referred to as the "reverse domain name hijacking" provision.

matter jurisdiction thus is apparent from the face of the SAC. *See Del Monte Int'l GmbH v. Del Monte Corp.*, 995 F.Supp.2d 1107, 1116 (C.D.Cal. 2014) (citations omitted) ("[w]hile plaintiff style[d] his . . . claim for relief as arising under the Declaratory Judgment Act, functionally it [was] indistinguishable from a claim under . . . § 1114(2)(D)(v)[,] and thus court had jurisdiction under the Lanham Act, which includes "actions involving the ACPA[]"); *see also Mann v. AFN Investments, Ltd.*, 2007 WL 2177030, at *1 (S.D.Cal. July 27, 2007) (claim under 15 U.S.C. § 1114(2)(D)(v) "arises under federal law for purpose of federal question jurisdiction under 28 U.S.C. § 1331[]"). Alternatively, it is possible to find, as did the court in *Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 2014 WL 3695487 (D.Or. July 24, 2014), that because Plaintiffs and Defendants are "each claim[ing] exclusive rights to the same domain name[] . . . there is a live controversy that is appropriate for resolution" under the Declaratory Judgment Act. *Id.* at *8- *9 (citing, *inter alia*, *Sallen*, 273 F.3d at 25 (finding live controversy where both parties were still "claiming exclusive rights to the same domain name").[7]

Having satisfied itself that it has subject matter over Plaintiff's first cause of action, there is one additional issue before turning to the merits. In arguing that Plaintiffs are not entitled to declaratory relief, Defendants are relying upon a number of factors, including that "[t]he UDRP . . . found Plaintiff in violation of the Uniform Domain Name Resolution Policy for bad faith registration of the domain name." *See* Mot. (Doc. 60) at 12:18-20 (citing DSOF (Doc. 61) at 5, ¶¶ 31-33 (reciting three UDRP findings). Without citing to any authority, Plaintiffs counter that that decision "is entitled to no deference by this Court[.]" Resp. (Doc. 64) at 12.

In their reply, Defendants clarify that "they are not relying on th[e] [NAF] decision

---

[7]     Consistent with the Court's reading of the SAC, as their answer evinces, Defendants read the SAC as alleging a ACPA claim as well. *See* Answer (Doc. 48) at 9, ¶ 2 (asserting "affirmative defense" to Plaintiffs' reverse domain name hijacking under the ACPA). The Court, therefore, can overlook this "technical pleading defect." *See Nationwide Mutual Insurance Company v. Liberatore*, 408 F.3d 1158, 1162 n. 2 (9th Cir. 2005) ("agreeing with the district court that the existence of federal question jurisdiction was readily discernable from the face of the complaint, and therefore amendment was not necessary to cure [Plaintiff's] technical pleading defect[]").

as binding" here.   Reply (Doc. 69) at 10:14.   Nor are Defendants relying upon the "precedential effect of that decision."   (*Id.* at 10:12).   Defendants are properly retreating from what certainly did appear to be their reliance, albeit slight, upon the NAF decision. *See Super-Krete Intern., Inc. v. Sadlier*, 712 F.Supp.2d 1023,   1033 (C.D.Cal. 2010) (giving no deference to findings of World Intellectual Property Organization panel in action by trademark owner against a competitor with confusingly similar registered domain name) (citing *Barcelona.com, Inc.*, 330 F.3d at 624–26 (noting that a WIPO Panel decision regarding the [("UDRP")] was not entitled to deference in a federal court proceeding; stating "[b]ecause the administrative process prescribed by the UDRP is 'adjudication lite' as a result of its streamlined nature and its loose rules regarding applicable law, the UDRP itself contemplates judicial intervention, which can occur before, during, or after the UDRP's dispute resolution process is invoked. . . . Moreover, any decision made by a panel under the UDRP is no more than an agreed-upon administration that is not given any deference under the ACPA."); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F.Supp.2d 612, 617 n. 10 (E.D.Va. 2002) (in considering motions for summary judgment, the court evaluated UDRP decision and findings but noted that the decision was not admissible on the merits of the liability issues)).   Accordingly, in resolving this summary judgment this Court will give no deference to the UDRP's decision and findings.

### 2.  ACPA

The SAC expressly alleges that Defendants 'had no *bona fide* basis for commencing the UDRP proceeding, and as such committed reverse domain name hijacking under the [ACPA]."   SAC (Doc. 75) at 10, ¶ 29.   Beyond this broad allegation, Plaintiffs provide no law or evidence to support this particular theory of liability under the ACPA.   Therefore, as earlier stated, the Court, as did the Defendants, interprets the SAC's allegations as a whole as alleging a claim for reverse domain name hijacking pursuant to 15 U.S.C. §  1142(D)(v) of the ACPA.

To prevail on a claim under that statute "requires a plaintiff to prove four

elements: (1) plaintiff is a domain name registrant; (2) plaintiff's domain name was 'suspended, disabled, or transferred under a policy implemented by a registrar as described in 15 U.S.C. § 1114(2)(D)(ii)(II);[8] (3) the trademark owner prompting the domain name to be transferred 'has notice of the action;' and (4) plaintiff's use or registration of the domain name is not unlawful."[9]  *AIRFX.com*, 2011 WL 5007919, at *2 (citing *Ricks* [*v. BMEzine.com, LLC*], 727 F.Supp.2d [936,] 959 [(D.Nev. 2010)] (*quoting Barcelona.com, Inc.*, 330 F.3d at 626) (footnote added).  Section 1142(D)(v), in turn, "requires a court to determine whether a party is in compliance with § 1125(d)[.]"  *Del Monte*, 995 F.Supp.2d at 1122 (citations omitted).  In other words, "to prove that [their] conduct was not unlawful" under section 1142(D)(v), Plaintiffs "need to prove either (1) [they] did not register, traffic, or use a domain name that is identical or confusingly similar to a distinctive mark, *or* (2) [they] did not have a bad faith intent to profit from that mark."  *See Domain Vault LLC v. Bush*, 2015 WL 1598099, at *10 (D.Colo. April 8, 2015) (emphasis added); *see also* 15 U.S.C. § 1125(d)(1)(A)(i)-(ii).

In their first cause of action, Plaintiffs are seeking, *inter alia*, a declaration "affirming th[eir] good-faith registration" of the disputed domain name.  SAC (Doc. 75)

---

[8]  "UDRP is one such policy that has been recognized to give rise to a § 11142(D)(v) claim."  *Mann*, 2007 WL 2177030, at *2 (citing *Barcelona.com, Inc.*, 330 F.3d at 625)).

[9]  The statute itself provides for a showing that "registration . . . of the domain name by such registrant is not unlawful under this *chapter*."  15 U.S.C. § 1114(2)(D)(v) (emphasis added).  "The First and Second Circuits have defined "this chapter," as used in 15 U.S.C. § 1114(2)(D)(v), to mean just the ACPA, *Sallen*[,] 273 F.3d [at] 18 []; *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 382 (2nd Cir. 2003), while the Fourth Circuit has defined that phrase to mean the entire Lanham Act, *Barcelona.com, Inc.*[,], 330 F.3d [at] 626 []."  *NextEngine Ventures, LLC v. Lastar, Inc.*, 2014 WL 6944877, at *5 (C.D.Cal. Dec. 8, 2014).  "The Ninth Circuit has not addressed this issue yet."  *Id.*  As in *NextEngine Ventures*, though, this "distinction is not relevant if [Plaintiffs] [are] unable to establish that [they] did not violate the ACPA, which is included within the Lanham Act."  *See id.*

- 15 -

at 10, ¶ 29(a).    In other words, in the language of the relevant statutes, Plaintiffs are seeking a declaration that the registration of the disputed domain name was "not unlawful[,]" *see* 15 U.S.C. § 1114(2)(D)(v), which encompasses a finding that Plaintiffs "did not have a bad faith intent to profit" from any of Defendants' three trademarks. *See* 15 U.S.C. § 1125(d)(1)(A)(i).

In seeking summary judgment as to Plaintiffs' first cause of action, Defendants make the singular argument that plaintiff Robinson's "bad faith registration of the [disputed] domain name . . . precludes a declaratory relief finding [of] 'good faith' in his favor."  Mot. (Doc. 60) at 10:18-20 (citation omitted).  15 U.S.C. § 1125(d)(1)(B)(i) enumerates a list of "nine non-exclusive factors to be considered in determining whether the domain registrant acted in 'bad faith.'"  *Calista Enterprises*, 43 F.Supp.2d at 1132. Five of those factors, according to the Defendants, "highlight" Plaintiffs' "bad faith registration" of the disputed domain name.  Mot. (Doc. 60) at 11:24.  Absent any contrary evidence, Defendants tacitly argue that Plaintiffs cannot establish that their conduct was not unlawful under the ACPA.  Hence, Defendants are entitled to summary judgment as to Plaintiffs' first cause of action.

Plaintiffs did not address the statutory bad faith factors at all.  Instead, exclusively relying upon the Term Sheet, Plaintiffs contend that there is a genuine issue of material fact as to whether plaintiff Robinson "registered the disputed domain [name] in bad faith[.]"  Resp. (Doc. 64) at 7 (emphasis omitted).  Defendants counter that Plaintiffs' reliance upon the Term Sheet is "misplaced" for several reasons. *See*  Reply (Doc. 8:9) (emphasis omitted).

Based upon the following five statutory factors, Defendants argue that Plaintiffs registered the disputed domain name in bad faith:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in

connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; . . . .

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties[.]"

15 U.S.C. §§ 1125(d)(1)(B)(i)(I) – (VI); and (VIII).  In examining these factors, the Court is cognizant that "'the most important grounds for finding bad faith are the unique circumstances of the case.'"  *Lahoti v. Vericheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002)).  These unique circumstances "affect the examination (and weight) of the nine permissive [statutory] factors."  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220 (9th Cir. 2012) (citations omitted).  In ascertaining the existence of bad faith, a court may also take into account "any other relevant considerations[.]"  *See id.* (citations omitted).

As to the first statutory factor, Plaintiffs have not shown that they have any trademark or other intellectual property rights whatsoever in the disputed domain name. Indeed, defendant FSE is the owner of and registered all three marks.  This factor thus weighs in favor of a finding of bad faith.  Defendants maintain that the second statutory factor shows bad faith as well.  "This factor recognizes that with the growing use of personal Web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their Web site.'"  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 2013 WL 4528539, at *23 (N.D.Cal. Aug. 23, 2013) (*quoting* 4 *McCarthy on Trademarks and Unfair Competition* § 25:78), *amended in part on other grounds*, 2013 WL 6157208 (N.D.Cal. Nov. 22, 2013).  Plaintiff Robinson admits that neither he nor Plaintiff SCSM "is known by the name 'College Hunks.'" DSOF (Doc. 61) at 3, ¶ 12 (citation omitted); PCSOF (Doc. 65) at 2, ¶ 12.  Consequently, this factor, too, augurs in favor of a finding of bad faith.

- 17 -

With respect to the third and fourth factors, there is nothing in the record showing that Plaintiffs engaged in a "*prior* use . . . of the [disputed] domain name in connection with the bona fide offering of any goods or services[.]"   *See* 15 U.S.C. § 1125(d)(1)(B)(i)(III) (emphasis added).   And, Plaintiffs have made no showing of a "bona fide noncommercial or fair use of [the] mark[] in a site accessible under the [disputed] domain name."   See 15 U.S.C. § 1125(d)(1)(B)(i)(IV).   Indeed, Plaintiff Robinson admitted that he has never used the disputed domain name "to promote any services [he] provide[s] under any business entity[.]"  DSOF, exh. F (Doc. 61-2) at 21:21-24); *see also* DSOF (Doc. 61) at 3, ¶ 16; PCSOF (Doc. 65) at 3, ¶ 16.  Similarly, Plaintiff Robinson has "not advertised a trademark of College Hunks Moving to the public." DSOF, exh. F (Doc. 61-2) at 31:9-10.   Furthermore, neither Plaintiffs Robinson nor SCSM "is known by the name 'College Hunks[;]'" nor have Plaintiffs conducted business under that name.   DSOF (Doc. 61) at 3, ¶¶ 12-13 (citations omitted); PCSOF (Doc. 65) at 2, ¶¶ 12 -13.  These undisputed facts also contribute to a finding of bad faith.  *See Lahoti*, 586 F.3d at 1202 (finding that Plaintiff "was motived by a bad faith intent to profit from his use of the Disputed Mark" where he "never used the Domain Name in connection with a bona fide offering of goods and services[]")

Defendants identify several other factors which they argue demonstrate bad faith under 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).   This particular statute pertains to the registration of "multiple domain names[,]" however, which is not the situation here.  *See* § 1125(d)(1)(B)(i)(VIII).   The other factors Defendants identify thus are not relevant under this particular subsection, but they are "other relevant considerations" which this Court may take into account in its bad faith analysis.  *See Rearden LLC*, 683 F.3d at 1220 (citations omitted).   One such factor is Plaintiff Robinson's concession that "[s]ince registering the domain name "collegehunksmoving.com" . . . in September 2009, the website has remained parked[.]"  DSOF (Doc. 61) at 4, ¶ 28 (citing exh. F (Doc. 61-2) at 23:24 – 24:4).   The website itself indicates that it is parked and it lists other moving companies.  (*See* DSOF, exh. F (Doc. 61-2) at 44.)

Another relevant consideration is that when plaintiff Robinson registered the

disputed domain name, he "knew that College Hunks Hauling Junk was a registered trademark[.]"  DSOF (Doc. 61) at 3, ¶ 14 (citation omitted); PCSOF (Doc. 65) at 2-3, ¶14.  Plaintiff Robinson also "admitted that he did not create the brand name College Hunks Moving on his own."  (*Id.* at 3, ¶ 18 (citation omitted); *Id.* at 3, ¶ 18).  In addition, "[o]ccasionally Plaintiff Robinson shortens College Hunks Hauling Junk' to 'College Hunks.'"  (*Id.* at 3, ¶ 19; *Id.* at 3, ¶ 19).  And, plaintiff Robinson "has heard other individuals refer to 'College Hunks Hauling Junk' as 'College Hunks.'"  (*Id*. at 3, ¶ 20; *Id.* at 3, ¶ 20).

Even in the face of this undisputed evidence, Plaintiffs insist that registration of the disputed domain name was done in "good faith, or at least the intent behind the registration is a materially disputed issue."  Resp. (Doc. 64) at 8.  The crux of this argument is that plaintiff Robinson's registration of the disputed domain name was part of "his responsibilities in the new joint venture[,]" which is the subject of the Term Sheet.  (*See id.* at 8).  Given the parties' failure to come to an agreement as to the Term Sheet, and because it never resulted in an executed agreement, Defendants contend that Plaintiff's reliance thereon is "misplaced[.]"  Reply (Doc. 69) at 8:9 (emphasis omitted).

There is no need for the Court to delve into the Term Sheet's contents, as Plaintiffs attempted to do, for the simple reason that plaintiff Robinson registered the disputed domain name on September 17, 2009 – two months before Mr. Friedman's November 11, 2009 e-mail of the Term Sheet to plaintiff Robinson.  *See* DSOF (Doc. 61) at 3, ¶ 11 (citations omitted); PCSOF (Doc. 65) at 2, ¶ 11; PSSOF (Doc. 65) at 5, ¶ 2.  Given the timing of these two events, coupled with the fact that the Term Sheet was never executed, Plaintiff Robinson cannot rely upon the Term Sheet to create a genuine issue of material fact as to whether his registration of the disputed domain name was in bad/good faith.

Further undermining Plaintiffs' attempt to create a genuine issue of material fact where none exists is plaintiff Robinson's own deposition testimony.  Plaintiff Robinson was directly asked whether he "believe[d] the proposal and term sheet authorized [him] to register the" disputed domain name.  DSOF, exh. F (Doc. 61-2) at 14:4-5.  Plaintiff Robinson candidly responded, "No, I don't' believe the term sheet gave authorization."

- 19 -

(*Id.* at 14:7-8).   During his deposition, plaintiff Robinson also acknowledged that no one at College Hunks Hauling Junk, including Messrs. Soliman and "Sullivan (sic)" told him "to register the [disputed] domain name[.]"  (*Id.* at 15:21-24).   Plaintiff Robinson's own statements, compounded with the timing of his registration of the disputed domain name and the date of transmission of the Term Sheet all soundly refute Plaintiffs' assertion that the disputed domain name was registered in good faith.   Thus, even viewing the evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, the Court finds that as a matter of law, Plaintiffs' registration of the disputed domain name was unlawful because it was done in bad faith.   The Court therefore grants summary judgment in Defendants' favor as to the first cause of action.

### C.  Cancellation of Mark '081 – Second Cause of Action

#### 1.  Subject Matter Jurisdiction

Plaintiffs' second cause of action seeks cancellation of the disputed mark ('081) under the Lanham Act.   Plaintiffs are seeking cancellation pursuant to 15 U.S.C. §§ 1064 and 1119 because allegedly Defendants fraudulently procured that mark.   Indisputably, the Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331, providing that district courts have original jurisdiction of all actions arising under the laws of the United States.   The Court likewise has subject matter jurisdiction in that 28 U.S.C. § 1338, confers original jurisdiction of all actions arising "under any Act of Congress relating to trademarks."   *See Del Monte*, 995 F.Supp.2d at 1116 (citing 15 U.S.C. § 1121; 28 U.S.C. § 1338) ("Federal courts have jurisdiction to adjudicate actions arising under the Lanham Act.").

#### 2.  Fraud in the Procurement

Plaintiffs are seeking cancellation of the '081 mark because allegedly, when Defendants filed their trademark application for that mark, they "intentionally submitted a forged/falsified specimen to the USPTO[.]"   SAC (Doc. 75) at 11, ¶ 33.   Purportedly, that specimen is false in that it "bears a date of 2010 on its face[,]" although the applicant swore under "penalty of perjury that is was a specimen example from 2007."  (*Id.*)

Defendants are moving for summary judgment on this cause of action, arguing, *inter alia*, that they "properly filed a specimen of use demonstrating the ['081] mark's use in commerce at the time of filing the application."  Mot. (Doc. 60) at 5:26-27.  In opposition, and unlike the SAC, Plaintiffs maintain that Defendants committed fraud upon the USPTO because the application for the '081 mark stated "that the date of first-use in commerce was January 2007[,] . . . "rather than its actual first use in 2010[.]" Resp. (Doc. 64) at 9; 3.  Additionally, Plaintiffs baldly assert that "[t]he date of Defendants' actual first use of the ['081] mark is a [disputed] genuine issue of material fact[,]" precluding summary judgment.  (*Id.* at 10).  Defendants reply that because the date of first use is immaterial to a claim of fraud in the procurement, they are entitled to summary judgment as to Plaintiffs' second cause of action seeking cancellation of the '081 mark.

"A party who believes he has been harmed by a trademark's registration may seek the cancellation of that trademark's registration on certain specified grounds, including that the trademark was obtained by the commission of fraud on the [(USPTO)]." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citations omitted).  "When a trademark's registration is cancelled, its owner is no longer entitled to the rights that flow from federal registration, including the presumption that the mark is valid." *Id.*  "To succeed on a claim for cancellation based on fraud, [a party] must adduce evidence of: (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the presentation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by the reliance." *Id.* (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)).  "A false representation in the original trademark application . . . may be grounds for cancellation if all five requirements are met." *Id.* (citation omitted).

The party seeking cancellation of a trademark registration for fraudulent procurement has "a heavy burden[.]" *Hokto Kinoko*, 738 F.3d at 1097 (citation omitted).

"To establish that a mark was registered fraudulently, a party must prove two things, both by clear and convincing evidence: First, the party must identify a deliberate attempt by the registrant to mislead the PTO, identifying statements or representations that prove more than mere error or inadvertence." *Halo Management, LLC v. Interland, Inc*, 308 F.Supp.2d 1019, 1031 (citing *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988)).   "Second, the party must show that misstatements were made 'with respect to a material fact—one that would have affected the PTO's action on the applications.'"  *Id.* "Neither of these analyses leave 'room for speculation, inference or surmise,' and the court must resolve any doubt 'against the charging party.'" *Id.* (quoting *Smith Int'l Inc. v. Olin Corp.*, 1981 WL 48127, 20 U.S.P.Q. 1033, 1044 (Trademark Tr. & App. Bd. 1981) (other citations omitted).   Plaintiffs have not shouldered their heavy burden in opposing summary judgment.

The second factor – a misstatement made with respect to a material fact – is central to Defendants' summary judgment motion on the Lanham Act cause of action. Therefore, the Court will begin, and, as it turns out, end its analysis with this factor.

"[T]o prove fraud that would result in the cancellation of [the '081] mark, there would have to be a *material* misrepresentation in the [application] on the basis of which the mark was registered."  *Pony Express Courier Corp. of Am. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989) (emphasis added).   Despite Plaintiffs' insistence, there was no material misrepresentation in the application for the '081 mark, and hence no resultant fraud.   That is because  "[f]ederal courts[,]" including the Ninth Circuit, "and the TTAB [Trademark Trial and Appeal Board] consistently have held that the *date of first use* is *immaterial* to a registration application so long as the actual date of initial use predated the application."  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 2014 WL 4759945, at *31 (D.D.C. Sept. 25, 2014) (emphasis added) (citing, *e.g.*, *Pony Exp*[*ress*], 872 F.2d [at] 319) (other citations omitted);  *see also Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 12, 1209 (11th Cir. 2008) (internal quotation marks and citations omitted) ("A misstatement of the date of first use

in the application is not fatal to the securing of a valid registration as long as there has been valid use of the mark prior to the filing date.")  Courts have similarly held that "'if the mark was in use in commerce as of the filing date, then the claimed date of first use, even if false, does not constitute fraud because the first use date is not material to the [USPTO's] decision to approve a mark for publication.'"  *Drew Estate Holding Co., LLC v. Fantasia Distribution, Inc.*, 2012 WL 864659, at *6-*7 (S.D.Fla. March 13, 2012) (quoting *Hiraga v. Arena*, 90 U.S.P.Q. 2d 1102, 1107 (TTAB 2009) (citations omitted).

Here, defendant FSE filed its application to register the '081 mark on November 16, 2010.  DSOF (Doc. 61) at 2, ¶ 3; PCSOF (Doc. 65) at 2, ¶ 3; *see also* DSOF, exh. C (Doc. 61-1) at 8.  That application states that "the mark was first used at least as early as 1/01/2007, and first used in commerce at least as early as 01/01/2007, and is now in use in such commerce."  DSOF, exh. C (Doc. 61-1) at 8.  To establish that the mark was "now in use in commerce," defendant FSE attached one specimen from CHHJ's website, also dated November 16, 2010, "showing the mark as used in commerce." (*Id*. at 11).  Under the "College Hunks Moving" logo is a brief company description, along with a list of reasons for choosing it.  (*Id*.)  Based upon the foregoing, even assuming *arguendo* that the January 1, 2007, date of first use is inaccurate, that cannot form the basis for Plaintiffs' fraud in the procurement claim.  This is all the more so given that Plaintiffs have not come forth with any evidence, much less clear and convincing, that Defendants knew or believed that their application for the '081 mark was false.  Thus, the Court grants summary judgment in Defendants' favor on Plaintiffs' second cause of action as well.

### D.  Attorneys' Fees Request

Defendants request an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a), which authorizes "[t]he court in exceptional cases [to] award reasonable attorney fees to the prevailing party."[10]  "The Act 'nowhere defines what makes a case 'exceptional.''"

---

[10]     "[A]s a general matter, a prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for work related to the Lanham Act claims."  *Gracie v. Gracie*, 217 F.3d 1060, 1069 (9th Cir. 2000).

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, 2009 WL 2513984, at *2 (S.D.Cal. Aug. 17, 2009) (quoting *Stephen W. Boney, Inc. v. Boney Svcs., Inc.*, 127 F.3d 821, 825 (9th Cir. 1997)).   The Ninth Circuit has found, however, that "[w]hen a defendant moves for attorney fees under the Lanham Act, a case is exceptional 'where a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith.'"   *Id.* at (quoting *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1231 (9th Cir. 2008) (other citation omitted)).

Relying strictly upon its summary judgment motion, and without any further elucidation, Defendants contend that because the SAC's first and second causes of action were "at least groundless and it was unreasonable to pursue such claims[,] . . . this case falls squarely in the exception category[.]"  Mot. (Doc. 60) at 13:18-19. Plaintiffs did not respond to this request in any way.  In their reply, Defendants make the blanket assertion that "it is clear there is no set of facts upon which Plaintiffs could prevail."  Reply (Doc. 69) at 2:14-15.   Defendants further claim that "Plaintiffs lacked a good faith basis in filing and maintain this action[,]" but again, they did not elaborate.  (*Id.* at 2:15-16).

The Ninth Circuit recognizes that "[t]he line distinguishing exceptional cases from non-exceptional cases is far from clear.   It is especially fuzzy where the *defendant* prevails due to plaintiff's failure of proof."  *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 687 (9th Cir. 2012) (emphasis in original). Nonetheless, "[t]he Ninth Circuit construes the 'exceptional circumstances' requirement 'narrowly.'"   *Brighton Collectibles, Inc.*, 2009 WL 2513984, at *4 (quoting *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008)).  "A determination that a trademark case is exceptional is a question of law for the district court[.]"  *Watec Co., Ltd. v. Liu,* 403 F.3d 645, 656 (9th Cir. 2005).

Under the totality of the circumstances, the Court finds that this case does not "fall on the []exceptional side of the dividing line."  *See Secalt S.A.*, 668 F.3d at 688.  Thus, in

---

Presumably, this is why Defendants limit their request for attorneys' fees to Plaintiffs' Lanham Act claim.

the exercise of its discretion, the Court finds that an award of attorneys' fees to Defendants under the Lanham act is not warranted.  *See  Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993), *superseded by statute on other grounds*, Trademark Amendments Act of 1999, Pub.L. No. 106–43, 113 Stat. 218 ("An award [of attorney fees] is within the discretion of the trial court and will not be disturbed absent abuse of that discretion.")  "Alternatively, even if this case were exceptional, the Court would exercise its discretion to deny attorney fees[.]"  *See Brighton Collectibles*, 2009 WL 2513984, at *4 (citing *Rolex Watch*[, *U.S.A., Inc. v. Michel Co.*], 179 F.3d [704,] . . . 711 [(9th Cir. 1999)] ("awards are never automatic and may be limited by equitable considerations."); *Polo Fashions*[, *Inc. v. Dick Bruhn, Inc.*], 793 F.2d [1132] . . . 1134 [(9th Cir. 1986)] (pointing out that under the Lanham Act, courts "may" award fees in exceptional cases; the Act does not require them).  Consequently, the Court denies Defendants' request for attorneys' fees under 15 U.S.C. § 1117(a).

Accordingly,

**IT IS THEREFORE ORDERED** granting Defendants' Summary Judgment Motion (Doc. 60) and dismissing Plaintiffs' Second Amended Complaint (Doc. 75) with prejudice; and

**IT IS FURTHER ORDERED** directing the Clerk of the Court to kindly terminate this action.

Dated this 15th day of May, 2015.

Honorable Diane J. Humetewa
United States District Judge